IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| JULIANN PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 15-1019 |
| vs. | ) | Judge Nora Barry Fischer |
| | ) | |
| BRIAN MILLER, WARDEN OF THE | ) | |
| FAYETTE COUNTY PRISON, IN BOTH | ) | |
| HIS OFFICIAL AND INDIVIDUAL | ) | |
| CAPACITIES; MICHAEL ZAVADA, | ) | |
| DEPUTY WARDEN OF THE FAYETTE | ) | |
| COUNTY PRISON, IN BOTH HIS | ) | |
| OFFICIAL AND INDIVIDUAL | ) | |
| CAPACITIES; AND BARRY | ) | |
| CROFTCHECK, DEPUTY WARDEN OF | ) | |
| THE FAYETTE COUNTY PRISON, IN HIS | ) | |
| OFFICIAL AND INDIVIDUAL | ) | |
| CAPACITIES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

I.    INTRODUCTION

This case arises from an alleged workplace assault that occurred at the Fayette County Jail

on August 3, 2013.  Plaintiff Juliann Puckett worked in the jail's kitchen for a contractor, and on

that day, she was physically injured by a corrections officer, Lori Chapman, during an altercation.

In light of this incident, Puckett brings a state-created danger claim under the Fourteenth

Amendment's substantive due process clause against the top three administrators of the jail:

Warden Brian Miller, Deputy Warden Michael Zavada, and Deputy Warden Barry Croftcheck

(collectively "the Wardens").  Now pending before the Court is the Wardens' joint motion for

summary judgment.  (Docket No. [46]).  The Wardens argue that they are entitled to judgment as

a matter of law because Puckett cannot satisfy the fourth element of her state-created danger claim;

that is, that they affirmatively used their authority in a way that created a danger to Puckett or

rendered her more vulnerable to danger than had they not acted at all. After careful consideration of the parties' written submissions and their oral arguments, and for the following reasons, the Court agrees with the Wardens that when accepting Puckett's evidence as true and drawing all reasonable inferences in her favor, a reasonable jury could not find in her favor with respect to that element. Therefore, the Wardens' motion for summary judgment [46] is GRANTED.

II.    FACTUAL BACKGROUND

In September 2012, Puckett began working in the jail's kitchen as a coordinator manager for Trinity, a contractor which provides food services to inmates at the jail. (Docket No. 47 at ¶¶ 4-6). Chapman had been working for the jail as a corrections officer since 2003. (*Id.* at ¶ 7). As noted, Miller is the Warden of the jail. (*Id.* at ¶ 1). Zavada was the Deputy Warden of Security and Croftcheck was the Deputy Warden of Treatment. (Docket No. 47 at ¶¶ 2-3; 48-13 at 10).

Prior to the altercation on August 3, 2013, Puckett was involved in several incidents with jail employees and contracted staff, including Chapman. In particular, on October 26, 2012, Puckett and Chapman had a disagreement about the side door of the prison not being unlocked to allow Puckett to enter, resulting in Puckett and Chapman each drafting an incident report. (Docket No. 47 at ¶¶ 16-17). Puckett claimed that Chapman used the "F" word several times; Chapman claimed that Puckett put her finger in Chapman's face, calling her a "bitch" and stating "I want your name." (*Id.* at ¶ 17).

Two days later, Puckett drafted a different handwritten statement discussing two separate incidents of verbal abuse and harassment, neither of which involved Chapman. First, a kitchen worker named Blair threatened to kill Puckett by pushing her down the steps "like a past employee a lot of years back." (*Id.* at ¶ 18). Second, a corrections officer, Lou Mauro, made an offensive drawing of Puckett when he was working in the control room. (Docket Nos. 47 at ¶¶ 18-19; 68 at

¶ 5).  According to Puckett's affidavit, Mauro was not originally assigned to work in the control room that day but switched posts with a different officer, without authorization.  (Docket No. 68 at ¶¶ 5-7).  Puckett heard Miller tell Mauro that "no switching of post assignments was to occur without approval of Miller" and "that post assignments must go through him."  (*Id.* at ¶ 7).  Dominick Carnicella, who was employed by Fayette County's Human Resources contractor, interviewed Puckett about her allegations of harassment on November 6, 2012; and, the next day, Miller issued a memorandum to all employees and contracted staff stating that teasing, name calling, intimidation, and disrespect are prohibited.  (Docket No. 47 at ¶¶ 20-22).  Miller warned that any employees engaging in such behavior will be subject to discipline up to and including termination of employment.  (*Id.* at ¶ 22).

After Miller circulated that memorandum, there were no incidents between Puckett and any of the other employees or contracted staff at the jail for more than five months.  (*Id.* at ¶¶ 23-25).  Then, on May 31, 2013, there was another dispute between Puckett and Chapman, wherein Chapman called Puckett a "bitch" and stated that she would knock Puckett out.  (*Id.* at ¶¶ 25-27, 31-32).  About a month later, Puckett had a meeting with Miller and Carnicella about this latest incident.  (*Id.* at ¶¶ 29, 30).  Puckett asked them to keep Chapman, as well as another corrections officer who had previously harassed her, Gerald Strickler, out of the control room (which was located next to the kitchen) when Puckett was scheduled to work.[1]  (*Id.* at ¶ 32).  Based on this meeting, Carnicella recommended to Miller that such arrangements be made and he agreed to

---

[1]     The Wardens admitted in their answer that Puckett complained about harassment with respect to the May 31, 2013 incident; however, they asserted that "she did not report a fear of physical violence" prior to August 3, 2013.  (Docket No. 20 at ¶ 23).  Each Warden provided consistent deposition testimony in this regard.  (Docket Nos. 48-7 at 5, 7; 48-12 at 4; 48-13 at 7, 10).  But, Puckett testified in her deposition that she reported to each of them that she was afraid of being assaulted by Chapman.  (Docket No. 48-2 at 47).  The Court notes that the Wardens also pleaded in their answer that her claim is barred to the extent that she instigated, initiated, and/or was an active or willing participant in the August 3, 2013 incident with Chapman.  (Docket No. 20 at ¶¶ 53-54).

implement same.  (Docket Nos. 47 at ¶¶ 33-34; 56 at ¶¶ 14-15).  In the interim, yet another incident occurred, this time between Puckett and two other corrections officers, Delverme and Shannon, where Puckett claimed that they did not respond to her request to be let out of the kitchen.  (Docket No. 47 at ¶ 28).

Following her meeting with Miller and Carnicella, Puckett did not see Chapman in the control room again for an entire month.  (*Id.* at ¶ 37).  On the other hand, Puckett saw Strickler in the control room once during that period.  (*Id.* at ¶ 38).  She complained to Zavada, who, in turn, promptly removed him from the area.  (*Id.*).

On Saturday, August 3, 2013 at approximately 3:00 a.m., Puckett reported for work.  (*Id.* at ¶ 73).  She was not originally scheduled to work that day but was covering for a co-worker, and she maintains she gave all of the Wardens advance notice of same.[2]  (Docket Nos. 47 at ¶ 74; 56 at ¶ 33; 68 at ¶¶ 9-10).  Chapman was scheduled to work the 7:30 a.m. to 3:30 p.m. shift that day.[3]

---

[2] As to Zavada, Puckett asserts in her affidavit that she reminded him "on August 2, 2013, the day before the incident, that [she] would be working the next day."  (Docket No. 68 at ¶ 10).  Thus, her affidavit is sufficiently specific as it relates to him.  However, with respect to Miller and Croftcheck, her affidavit is vague and conclusory, as it does not identify them by name and only states: "I informed the Front Office/Wardens/Shift Commanders on two Wednesdays prior to the date of the incident that I would be covering for Joe 8/3/13, the date of the incident."  (*Id.* at ¶ 9).  At oral argument, the Court questioned whether this affidavit should be disregarded under the "sham affidavit" doctrine, which provides: "When a deponent's post-deposition affidavit conflicts with [her] prior testimony, a district court may disregard the affidavit to prevent a party from 'creat[ing] a material issue of fact to defeat summary judgment by filing an affidavit disputing … her own sworn testimony without demonstrating a plausible explanation for the conflict.'"  *In re Avandia Mktg., Sales Prac. & Prod. Liab. Litig.*, 639 F. App'x 874, 877 (3d Cir. 2016) (citations omitted).  The Wardens responded that they are not making the argument that Puckett's affidavit is a "sham affidavit" and that this issue is for the Court to decide.  (Docket No. 69).  Because Puckett's affidavit does not appear to contradict any statements that she made during her deposition on this issue, the Court declines to disregard it under this doctrine.  *See Baer v. Chase*, 392 F.3d 609, 624-25 (3d Cir. 2004).  In addition, the Court notes that even when accepting what Puckett stated in her affidavit as true, it does not create a material issue of fact to defeat summary judgment.  *Id.*  As such, the Court will assume for the purpose of resolving the pending motion that Puckett also notified Miller and Croftcheck that she would be working on August 3, 2013, notwithstanding that each Warden specifically denied this fact in his deposition.  (Docket Nos. 48-7 at 7; 48-12 at 7; 48-13 at 10).

[3] Because Chapman is a union employee, a bid process set forth in the collective bargaining agreement, rather than any action by the Wardens, determines the days when she works.  (*Id.* at ¶¶ 41-45).

4

(Docket No. 47 at ¶¶ 97, 99). Croftcheck arrived at the jail at approximately 6:00 a.m. or 7:00 a.m. (*Id.* at ¶ 86). Miller and Zavada were not working that day. (*Id.* at ¶¶ 78, 82).

When a corrections officer arrives for work, there are a number of different "posts" (designated areas within the jail) to which he or she may be assigned. (*Id.* at ¶ 47). The post assignments for corrections officers are rotated every day and the corrections officers do not know what post they will be working until the beginning of the shift. (*Id.* at ¶¶ 46, 49, 50). On Saturdays, post assignments are generally made by the shift commander (lieutenant rank).[4] (*Id.* at ¶¶ 45, 51). Lieutenant John Lenkey was the shift commander on duty that day. (*Id.* at ¶ 90). At that point in time, Lenkey had been working at the jail for approximately six months.[5] (Docket No. 43-18 at 8).

In an affidavit, Lenkey admits to assigning Chapman to work in the control room on August 3, 2013. (Docket Nos. 47 at ¶ 92; 48-14 at ¶ 4). Likewise, all of the Wardens specifically denied being involved in this particular assignment during their depositions. (Docket Nos. 47 at ¶¶ 81, 85, 88; 48-7 at 14; 48-12 at 7; 48-13 at 5). Nevertheless, Puckett stands by her allegations that the Wardens made the August 3, 2013 assignment, without evidence to support same. (Docket Nos. 12 at ¶¶ 32-33, 41; 56 at ¶¶ 16-19, 21-27).

---

The collective bargaining agreement requires that corrections officers' work schedules be posted in two weeks in advance, absent an emergency situation. (Docket No. 48-11 at 10).

[4]    Both Zavada and Croftcheck testified in their depositions that Zavada, as the deputy warden of security, made the corrections officers' post assignments during the week, but not on the weekends. (Docket Nos. 48-12 at 5; 48-13 at 5). They explained that the lieutenant shift commander was generally in charge of making post assignments on weekends. (Docket Nos. 48-12 at 5; 48-13 at 5). Miller also testified that "[n]o one really did the scheduling. It was basically whoever the lieutenant was that day." (Docket No. 48-7 at 9). Croftcheck denied ever being personally involved in making post assignments because he was the deputy warden of treatment and his role did not include such tasks. (Docket No. 48-13 at 5).

[5]    Thus, the October 26, 2012 incident between Puckett and Chapman occurred before Lenkey started working in the jail, and the May 31, 2013 incident occurred approximately four months thereafter.

Shortly after Chapman began her 7:30 a.m. shift that day, Puckett saw her in the control room. (Docket No. 47 at ¶ 109). Chapman looked into the kitchen where Puckett was located and stated: "Just look at her [Puckett], she's just miserable, miserable, miserable."[6] (*Id.* at ¶ 111); (Docket No. 48-2 at 32). Puckett told her co-worker, Natalie Mills, "I will be back, I'm not putting up with this," and went to the front office to complain.[7] (Docket No. 47 at ¶¶ 111, 114). In order to get from the kitchen to the front office, Puckett had to pass through the control room and needed a corrections officer, Michael Vasiloff, to unlock two gates (one between the kitchen and the control room and one between the control room and the front office).[8] (*Id.* at ¶¶ 112-113). When Puckett arrived at the front office, Officer Bill Simon, Lenkey, and Croftcheck were behind the counter. (*Id.* at ¶ 114). Croftcheck was talking to a civilian in street clothes. (*Id.*). Puckett told Simon that she just wanted to be left alone and informed Lenkey that "Lori Chapman is in the middle [control room], she's not permitted to be there." (*Id.* at ¶¶ 116-117) (alteration in original). Lenkey said that he would "take care of it" and picked up the phone to call someone. (*Id.* at ¶¶ 118-119). Puckett then left the front office to return to the kitchen. (*Id.* at ¶¶ 122-123).

Chapman was sitting at the desk and was on the phone with Lenkey when Puckett was passing through the control room on her way to the kitchen. (*Id.* at ¶ 123). Puckett asked Vasiloff to open the gate between the control room and the kitchen. (*Id.* at ¶¶ 124-125). As he began to

---

[6]  Although Chapman admitted in her deposition that she knew H.R. was going to keep her away from Puckett, she denied knowing that Puckett was working this day until she was assigned to the control room. (Docket No. 48-3 at 5-6, 12).

[7]  Prior to this incident, Mills had never seen a problem between Puckett and Chapman. (Docket No. 48-17 at 14). Mills first learned that Puckett was working this day when she arrived to work in the morning. (*Id.*).

[8]  As explained below, Vasiloff was initially a Defendant in this case but Puckett withdrew her claim against him in response to his motion for summary judgment. (Docket No. 66). He testified prior to arriving at the control room, he did not know that Puckett would be working this day. (Docket No. 48-4 at 11).

open the gate, Chapman told Puckett that there was no movement during head count.[9]  (*Id.* at ¶¶ 125, 126).  Puckett responded, "I am not an inmate" and "don't talk to me."  (*Id.* at ¶¶ 127, 128).  Chapman replied, "I'll fucking talk to whoever I want."  (*Id.* at ¶ 129).  Puckett countered, "I'm not putting up with this," but Chapman retorted, "Oh, yes, you will."  (*Id.*).  Puckett then exclaimed, "You're not the warden, I'll be speaking to the warden."  (*Id.* at ¶ 130).

Puckett no longer wanted to finish her shift and just wanted to go home.  (*Id.* at ¶ 131).  So, rather than continuing into the kitchen, Puckett began to turn away from the kitchen gate.  (*Id.* at ¶ 132).  At that moment, Chapman grabbed Puckett and said: "You get your fucking ass in that kitchen, get your fat ass in that kitchen, get your fucking ass in that kitchen."  (*Id.* at ¶¶ 132, 133).  She repeatedly told Vasiloff: "Open the fucking gate, open the fucking gate."  (*Id.* at ¶ 134).  He began to open the gate while Chapman was holding Puckett's chest with both hands.  (*Id.* at ¶¶ 135-136).  Chapman then turned Puckett around so that the two were facing each other and started pushing Puckett into the kitchen; but Puckett could not get through because the gate was not fully open.  (*Id.*).  Chapman grabbed Puckett by her shoulders and "body slammed [her] against the partially opened gate – trying to get [her] into the small opening."  (*Id.* at ¶ 137).  By slamming Puckett into the gate, the gate actually shut, prompting Chapman to scream to Vasiloff to open the gate again.  (*Id.* at ¶¶ 138-139).  When he was opening the gate the second time, Chapman bent Puckett's shoulders around the partially opened gate and then kept squeezing her muscles "tighter

---

[9]      A head count is where the corrections officers on the different ranges count the inmates and then call the control room with their respective numbers so that the total number of inmates in the jail can be complied and verified.  (Docket No. 47 at ¶¶ 100-101).  Head counts occur every three to four hours at the jail.  (*Id.* at ¶ 102).

and tighter." (*Id.* at ¶¶ 141-142). She then shook Puckett "vigorously" and slammed her head against a steel gate.[10] (*Id.*).

Puckett pressed the duress alarm, which is used by staff members to signal that they are in danger and need help. (*Id.* at ¶¶ 165-167). Croftcheck and Lenkey responded to the control room. (*Id.* at ¶ 173). Croftcheck immediately told Chapman to leave the area and then suspended her with pay pending an investigation. (*Id.* at ¶ 175). After Puckett left the jail, she went to the Uniontown Police Station with her co-worker, Mills, and made a report to Officer John Kauer, stating Chapman had attacked her causing injuries to her right and left arms. (*Id.* at ¶¶ 178-179). Next, Puckett went to the Uniontown Hospital. (*Id.* at ¶¶ 180-185). She returned to the hospital two days later. (*Id.* at ¶¶ 191-199). Puckett was diagnosed with a contusion on her chest wall, closed head injury, neck sprain, back sprain, and sprain of shoulder.[11] (*Id.* at ¶¶ 184, 195).

## III.    RELEVANT PROCEDURAL HISTORY

---

[10]    The Wardens' statement of facts also sets out the officers' version of the events leading to the attack, which differs from Puckett's version. (Docket No. 47 at ¶¶ 144-157). Specifically, they contend that Puckett instigated the entire situation by attempting to open the gate when Vasiloff was closing it and by swearing at Chapman and pushing her in the chest. (*Id.*). For purposes of resolving the pending motion, however, the Court accepts Puckett's version of the events as true. *See, e.g., Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (at the summary judgment stage, courts must adhere to the axiom that the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor).

[11]    The Court notes that in Puckett's statement of facts, (Docket No. 56), she asserts that "Defendants tipped their hand that they would lie about the attack" because sometime thereafter, "[a] 'white shirt' asked Plaintiff's co-worker, Natalie Mills, if she saw Chapman's attack." (*Id.* at ¶ 40). According to Puckett, when Mills responded "yes," the unidentified individual stated, "Well it doesn't matter what you say, we all stick together." (*Id.*). In their written submissions and at oral argument, the Wardens argued that this statement is inadmissible hearsay and could not be introduced at trial. *See* (Docket No. 63 at 2) (citing *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 226 (3d Cir. 2000) ("[H]earsay statements can be considered on a motion for summary judgment only if they are capable of admission at trial.")). Although Puckett initially contested that the described statement was hearsay in her sur-reply brief, (Docket No. 65 at 2), Puckett's counsel conceded at oral argument that the law offered by the Wardens appears to be against her on this point and withdrew the statement. Puckett's counsel also noted, correctly, that the statement is not material to whether summary judgment should be granted or denied.

Puckett initiated this case on August 2, 2015.  (Docket No. 1).  In addition to the Wardens, Puckett originally sued Chapman, Vasiloff, and Robert Yatsko.  (*Id.*).  All of those Defendants filed a motion to dismiss on December 28, 2015.  (Docket No. 5).  In Puckett's response, she "concede[d] that the state-created danger cause of action would not stand as to [Officer] Chapman."  (Docket No. 10 at 6).  Accordingly, the Court granted the Defendants' motion to dismiss as to Chapman and ordered that Puckett file an amended complaint.  (Docket No. 11).  Puckett filed her amended complaint on March 11, 2016, prompting Defendants to file another motion to dismiss.  (Docket Nos. 12, 14).  The Court denied the renewed motion to dismiss on April 15, 2016 and entered a case management order on May 24, 2016, setting fact discovery to conclude on October 7, 2016.  (Docket Nos. 18, 35).  After extending the discovery period three times, the Court entered a summary judgment motion and briefing schedule at the parties' request.[12]  (Docket Nos. 40, 42, 44, 45).

In accord with that briefing schedule, Defendants filed the pending motion for summary and related documents on July 11, 2017.  (Docket Nos. 46-49).  Puckett responded to same on August 21, 2017.[13]  (Docket Nos. 54-47).  In doing so, Puckett withdrew her claim against Vasiloff

---

[12]     As this case involves a workplace injury, the Court has learned from the parties during the course of the proceedings that Puckett filed a workers' compensation claim against her employer, Trinity, for which she has received compensation for lost wages and medical bills, resulting in a lien of approximately $180,000 being asserted against her in this case.  Hence, the parties elected to proceed with early neutral evaluation to satisfy this Court's mandatory ADR requirements.  (Docket Nos. 33, 35, 37).  Since the matter did not settle through ADR or otherwise, the Wardens elected to proceed with filing a motion for summary judgment.  In this regard, the Wardens attached the transcript from the workers' compensation proceedings as Exhibit A to their Appendix.  (Docket No. 48-1).

[13]     In addition, Puckett filed a motion for leave to file a second amended complaint on August 21, 2017, seeking to include a paragraph that the Wardens "engaged in the alternative affirmative acts of assigning the Shift Commander the task of scheduling the work posts while concealing from them that Chapman had the intention to assault the Plaintiff."  (Docket Nos. 52 at ¶ 5; 52-1 at ¶ 33a).  The Court denied Puckett's motion on September 1, 2017 because it was not supported by good cause under Rule 16 and would have resulted in undue delay and unnecessary costs to the Wardens under Rule 15, given that Defendants had already moved for summary judgment the month before.  (Docket No. 62).  In so holding,

and Yatsko.[14]  (*Id.*).  Thus, on September 11, 2017, the Court entered an order dismissing those Defendants from the case, with prejudice.  (Docket No. 66).  The Wardens replied to Puckett's summary judgment submissions on September 1, 2017 and Puckett filed a sur-reply a week later. (Docket Nos. 63-65).  The Court held oral argument on October 2, 2017, at which time the parties declined to submit supplemental briefing.  (Docket No. 69).  The Wardens' motion for summary judgment, therefore, is fully briefed by the parties and is ripe for disposition.

IV.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  In this context, a fact is "material" if it might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).  When ruling on a motion for summary judgment, the Court does not weigh the evidence or engage in credibility determinations. *Anderson*, 477 U.S. at 255.   The Court accepts the non-movant's evidence as true and draws all reasonable inferences in that party's favor.  *Id.*

"[T]he moving party bears the initial burden of showing that the non-movant has failed to establish one or more essential elements of [her] case." *Guidotti v. Legal Helpers Debt Resolution,*

---

however, the Court noted that nothing prevented Puckett from making this concealment argument in her opposition to summary judgment.  (*Id.*).  The Court addresses same below.

[14]    Vasiloff and Yatsko were the only Defendants to raise qualified immunity as a defense. (Docket No. 46; 49 at 14-15).  Even if the Wardens had also asserted this defense, such analysis would be unnecessary given the Court's conclusion that the Wardens did not violate Puckett's constitutional rights. *District of Columbia v. Wesby*, --- U.S. ---, --- S. Ct. ---, 2018 WL 491521, at *10 & n. 7 (2018).

*LLC*, 716 F.3d 764, 772 (3d Cir. 2013).  If the moving party satisfies that initial burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Cartett*, 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(e)).  Unsupported assertions, conclusory allegations, mere suspicions, or inferences based upon speculation or conjecture are insufficient to overcome a motion for summary judgment.  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010); *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014).

V.    DISCUSSION

Puckett asserts her Fourteenth Amendment state-created danger claim against the Wardens under 42 U.S.C. § 1983.  (Docket No. 12 at ¶¶ 38-47).  "By itself, Section 1983 does not create any rights, but provides a remedy for violations of those rights created by the Constitution or federal law."  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906-07 (3d Cir. 1997).  To prevail on a § 1983 claim, the plaintiff must show that the defendants, acting under color of state law, deprived her of a right secured by the Constitution or the laws of the United Sates.  *Id.* at 907.  Here, the Wardens do not contest that they were acting under color of state law during the relevant time period, and their argument focuses on whether they violated Puckett's rights under the Fourteenth Amendment.  (Docket Nos. 47, 63).  In this regard, the Court notes that the Wardens, as supervisory defendants, may not be held liable under § 1983 for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*, and Puckett must establish that each Warden, through his own individual actions, violated the Fourteenth Amendment.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The due process clause of the Fourteenth Amendment provides, in pertinent part, that: "No State … shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[N]othing in the language of the Due Process clause itself requires the State to *protect* the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County. Dep't of Soc. Svcs.*, 489 U.S. 189, 195 (1989) (emphasis added). This constitutional provision operates to prevent the government from "abusing its power or using it as an instrument of oppression." *Ye v. United States*, 484 F.3d 634, 636 (3d Cir. 2007). It does not impose an "affirmative obligation on the government to protect its citizens," *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008), nor does it guarantee that a state-run workplace be free from unreasonable risks of harm or ill-advised personnel decisions. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 1071 (1992); *Bishop v. Wood*, 426 U.S. 341, 350 (1976). Yet, "there is an exception to this general rule that nevertheless holds an officer liable if his conduct exposes an individual to a 'state-created danger.'" *Kedra v. Schroeter*, 876 F.3d 424, 436 (3d Cir. 2017).

In order to prevail on a state-created danger claim, a plaintiff must establish the following four elements: (1) the harm caused by the defendant was "foreseeable and fairly direct"; (2) the defendant "acted with a degree of culpability that shocks the conscience"; (3) the state and the plaintiff had a relationship such that "the plaintiff was a foreseeable victim of the defendant's acts"; and, (4) the defendant "affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the [defendant] not acted at all." *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006). The fourth element – the "affirmative act" requirement – is often the most hotly contested, as it is here. *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 235 (3d Cir. 2016).

Under the fourth element, "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282. This requirement "serves an important purpose: to distinguish cases where officials might have done more from cases where officials created or increased the risk itself." *Morrow v. Balaski*, 719 F.3d 160, 185-86 (3d Cir. 2013) (en banc) (Ambro, J., concurring, in part); *id.* at 179 (McKee, J., Majority Op.) (quoting same). While the rule is easily stated, courts have struggled to apply it, as "[t]he line between action and inaction is not always clear." *Phillips*, 515 F.3d at 235-36. The Court of Appeals recently attempted to clarify the inquiry:

> Rather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the "status quo" of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo.

*See L.R.*, 836 F.3d at 243. Even if a plaintiff establishes that a defendant committed an affirmative act, there must be a direct causal relationship between the affirmative act and the plaintiff's harm. *Phillips*, 515 F.3d at 236-37. In other words, the affirmative act must be the "but for cause" of the danger faced by the plaintiff. *Kaucher v. County of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006). "Only then will the affirmative act render the plaintiff 'more vulnerable to danger than had the state not acted at all." *Id.* (quoting *Bright*, 443 F.3d at 281).

In this case, Puckett contends that the Wardens engaged in an affirmative act when they scheduled Chapman to work in the control room on August 3, 2013, despite their knowledge that she intended to physically assault her.[15] (Docket No. 12 at ¶¶ 32-33, 40-43). According to the

---

[15] Puckett also alleged in her amended complaint that the Wardens are at fault because they "scheduled Chapman to work in the prison at the same time the Plaintiff was working in the prison." (Docket No. 12 at ¶ 32-33, 41-43). The Court notes, however, that Puckett has since abandoned this allegation, as the specific days and shifts when Chapman works at the jail are governed by the bid process set forth in the collective bargaining agreement between the corrections officers' union and Fayette County,

Wardens, there is no evidence in the record supporting this assertion. (Docket Nos. 49 at 1-7; 63 at 1-5). During their depositions, each Warden denied scheduling Chapman to work in the control room on August 3, 2013. (Docket Nos. 48-7 at 14; 48-12 at 7; 48-13 at 7-8). Rather, Lenkey stated in an affidavit that he, as the shift commander on duty that day, personally assigned Chapman to work in the control room. (Docket No. 48-14 at ¶¶ 3, 4). Despite same, Puckett contends that a genuine dispute as to this material fact remains because "[t]he discovery record is replete with evidence that the [Wardens] were personally involved in the assignment of work posts *at all times*." (Docket No. 55 at 6) (emphasis added).

Regarding Miller, Puckett directs the Court to two incidents that occurred before August 3, 2013. First, Puckett reiterates that Miller told Mauro in October 2012 that "no switching of post assignments was to occur without [his] approval" and "that post assignments must go through him," in light of the circumstances where Mauro switched posts with a co-worker and harassed Puckett by making an inappropriate drawing of her.[16] (Docket No. 68. at ¶¶ 5-7). Second, Puckett reminds the Court that on July 1, 2013, Miller adopted H.R.'s recommendation and agreed to *keep away* Chapman and Strickler from the control room on days when Puckett was working in the kitchen.[17] (*Id.* at 4). When taken as true, these events, at most, establish that Miller had the authority to make or adjust his corrections officers' post assignments; but they do not establish

---

not by any of the Wardens. *See* (Docket No. 56 at ¶¶ 41-50) (Puckett admitting that this fact is true but asserting that it is not material).

[16]    It is undisputed that things "calmed down" for several months following this incident. (Docket No. 47 at ¶¶ 23-25).

[17]    Although Puckett does not contend that Miller's agreement to implement these arrangements was an affirmative act, the Court opines that it was not. *See Ye*, 484 F.3d at 641 ("[A]n assurance, in this case an expression of intent to help, is not an affirmative act sufficient to trigger constitutional obligations."); *Bright*, 443 F.3d at 284 (no affirmative act where a police officer assured the plaintiff that a dangerous person would be arrested immediately but no action was taken and the dangerous person murdered the plaintiff's eight-year-old daughter three weeks later).

that he actually assigned Chapman to work in the control room on August 3, 2013, as Puckett maintains. *Cf. L.R.*, 836 F.3d at 244 (holding that the plaintiffs pleaded an affirmative act by alleging that the teacher had the authority to release his kindergarten student from his classroom and that *he used it*).

As to Zavada, Puckett relies on a prior event, as well as a general statement that Zavada made during his deposition. Puckett points out that less than a month before the alleged assault, Zavada removed Strickler from the control room immediately after learning that he was in there. (Docket No. 55 at 4). Puckett also stresses that Zavada testified during his deposition that the shift commanders generally made the post assignments on the weekends unless there was a "problem or complaint." (*Id.* at 3). According to Puckett, there was an obvious problem with respect to Chapman, given she had to meet with Carnicella and Miller, which meeting resulted in Miller agreeing to implement arrangements to keep Chapman away from her. (*Id.*). At most, this evidence shows that he had the authority to make post assignments; it does not establish that he used that authority on the day in question. *See L.R.*, 836 F.3d at 244.

Unlike the other Wardens, Croftcheck was actually in the jail during the fight. (Docket No. 47 at ¶¶ 78, 82, 86). Here, Puckett relies on something Croftcheck did *after* the scuffle; he assigned Chapman to a different post in the jail. (Docket No. 55 at 4). Yet, no reasonable jury could conclude that Croftcheck's power to switch Chapman's post assignment following the alleged assault establishes that he used his authority to assign her to the control room post on that day, in the first instance. *See L.R.*, 836 F.3d at 244. Puckett also offers no evidence to counter his deposition testimony that his role as the deputy warden of treatment did not involve in scheduling

corrections officers' post assignments or dealing with conflicts between officers and contracted staff.[18]  (Docket No. 48-13 at 7, 10).

As set forth above, Puckett has failed to refute the Wardens' evidence which shows that, contrary to Puckett's position, Lenkey, and not the Wardens, scheduled Chapman to work in the control room on August 3, 2013.  *See Celotex*, 477 U.S. at 324 (once the moving party satisfies its burden, the non-moving party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial); *Halsey*, 750 F.3d at 287 (inferences must flow directly from admissible evidence and cannot be based upon speculation or conjecture).  In fact, not only does Puckett fail to deny in her responsive statement of facts that Lenkey was the individual who assigned Chapman to the control room post on August 3, 2013, but she also admitted in her deposition that she does not know how Chapman came to be in the control room that day.  (Docket No. 56 at ¶¶ 77, 90-92); *see also Hughes v. Allegheny County Airport Authority*, 2017 WL 2880875, \*1 (W.D. Pa. 2017) (explaining that under Local Rule 56, "[a] non-moving party faces severe consequences for not properly responding to a moving party's concise statement" because such facts are deemed admitted for the purpose of deciding the motion); *Boyd v. Citizens Bank of Pennsylvania, Inc.*, 2014 WL 2154902, \*2-3 (W.D. Pa. 2014) (the Court "requires strict compliance" with Local Rule 56).  Hence, this allegation against the Wardens cannot stand, as it is based on subjective speculation.  *Halsey*, 750 F.3d at 287.  The Court also rejects Puckett's contention that this issue involves a credibility determination for a jury to make at trial.  *See Uhl v. County. of Allegheny*, 2008 WL 2858412, at \*7 (W.D. Pa. 2008) ("Plaintiff's account . . . appears

---

[18]      Croftecheck testified that he only dealt with Puckett if there was an issue with food services, such as a menu change.  (Docket No. 48-13 at 7).  He stated that if she approached him "about conflicts between officers and her," he "directed her to the deputy warden of security [Zavada] because that's out of his realm as deputy warden of treatment."  (Docket No. 48-13 at 7, 10).

to constitute his 'own subjective interpretation of the events' based on speculation rather than the presentation of credible conflicting evidence based on facts").

Puckett's alternate assertion that the Wardens concealed from the shift commanders that Chapman intended to physically assault her is likewise speculative. (Docket No. 55 at 4-6, 7; 65 at 3). Puckett supports her claim with "the testimony of the Wardens, wherein they claimed that they tasked the Shift Commanders with making the post assignments." (Docket No. 65 at 3). In making this argument, she points to no evidence from which a reasonable jury could conclude that active concealment occurred in this case. (Docket Nos. 56 at ¶¶ 27-28, 33, 43). *See Betts,* 621 F.3d at 252 (unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome summary judgment). Therefore, Puckett cannot escape summary judgment by recasting the Wardens' alleged omissions in this case as concealment. *See Phillips,* 515 F.3d at 236 ("[W]e have never found a state-created danger claim to be meritorious without … [a] showing that state authority was affirmatively exercised.").

Beyond Puckett's failure to support her allegations with evidence, the Court agrees with the Wardens that under *Morrow* and other applicable Third Circuit precedent, their alleged conduct in this case does not constitute an affirmative act as a matter of law. (Docket Nos. 49 at 1-7; 63 at 4-5). In *Morrow*, two high school-aged sisters, Brittany and Emily Morrow (collectively "the Morrows"), alleged that they "were subjected to bullying in the form of a series of threats, assaults, and acts of racial intimidation at the hands of a fellow student and her accomplice." *Morrow,* 719 F.3d at 179. Initially, the bully threatened Brittany on the phone and the internet. *Id.* at 164. Two days later, the bully physically attacked her in the school's lunch room, resulting in a three-day suspension. *Id.* At the recommendation of the school's assistant principal, the Morrows' mother reported the bully to the police. *Id.* Although the police charged the bully with simple assault,

terroristic threats, and harassment, the bully attacked Brittany a second time shortly after returning from the suspension. *Id.* This time, the bully attempted to throw Brittany down a set of stairs, while calling her offensive names and taunting her. *Id.* Following the second incident, the juvenile court placed the bully on probation and issued two orders prohibiting her from having contact with Brittany. *Id.* Said "no-contact" orders were provided to the school and the assistant principal. *Id.* Nevertheless, shortly after issuance of the second no-contact order, the bully boarded Brittany's bus, which she did not ride, and threatened her. *Id.* That evening, the bully elbowed Brittany in the throat at a football game, and a few days later, the bully's friend struck Emily in the throat. *Id.*

Although the Morrows reported the above incidents to school officials, the officials refused to guarantee their safety. *Id.* at 164-65. Rather than expel the bully and her friend, the officials suggested that the Morrows transfer to another school, which they did. *Id.* at 165. The Morrows, through their parents, initiated an action under § 1983 against the school district and the assistant principal under a state-created danger theory. *Id.* The District Court "was sympathetic to the [the Morrows'] plight," but nevertheless dismissed their case at the pleading stage. *Id.* On appeal, the Morrows argued that the defendants engaged in the affirmative act of suspending the bully but then permitting her to return to school rather than expelling her. *Id.* at 177. The Court of Appeals, sitting en banc, rejected this argument because the school officials did not create a new danger for the Morrows or render them more vulnerable to danger than had the state not acted at all. *Id.* at 178 (quoting *Bright,* 443 F.3d at 281). In this regard, the Court noted that "the suspension likely made the Morrows safer, albeit temporarily." *Id.* The Court also rejected the Morrows' argument that the school officials engaged in an affirmative act by permitting the bully to board the Morrows' bus, since "the only reasonable interpretation of that allegation is that the Defendants *failed* to take

any affirmative steps to ensure that [the bully] did not board the bus." *Id.* (emphasis in original). Both of these arguments, the Court concluded, were impermissible "attempts to morph passive inaction into affirmative acts." *Id.* at 179; *see also H.J. by Wells v. Delaphlaine McDaniel Sch.*, 2017 WL 5901096, *4 (E.D. Pa. 2017) (applying *Morrow* and dismissing an elementary school student's claim alleging that school officials allowed and encouraged bullying to occur, failed to punish the bullies, and instead punished the victim for complaining).

Unlike the persistent physical bullying of high school students that occurred in *Morrow*, Puckett and Chapman are adult women who were involved in two non-physical incidents, which were seven months apart, prior to the August 3, 2013 incident. (Docket No. 47 at ¶¶ 16-17, 25-27). The October 26, 2012 incident concerned a disagreement in which profane language was used about a prison door not being unlocked for Puckett, and the May 31, 2013 incident consisted of Chapman allegedly calling Puckett a "bitch" and threatening to knock her out. (*Id.*). Following a meeting on July 1, 2013 about the second incident, Miller adopted H.R.'s recommendation and agreed to implement arrangements that Chapman not be scheduled to work in the control room when Puckett was in the kitchen. (*Id.* at ¶¶ 33-34). Puckett did not see Chapman again until August 3, 2013 when Chapman was assigned to the control room. (*Id.* at ¶37). On these facts, even assuming that the Wardens actually assigned Chapman to the control room post that day or alternatively concealed her intent to harm Puckett from the shift commanders, as Puckett alleges, such conduct is not an affirmative act engendering liability in this context. (Docket No. 12 at ¶¶ 32-33, 40-43).

In this Court's mind, Puckett's argument that the Wardens should be held liable for making Chapman's post assignment is akin to the Morrows' argument that temporarily suspending a violent bully rather than expelling her is an affirmative act. *Morrow*, 719 F.3d. at 177. Indeed,

Puckett is essentially arguing that the Wardens affirmatively misused their authority by temporarily suspending Chapman from the control room for a month and then permitting her to return. (Docket No. 55 at 4-6, 7; 65 at 3). Just as in *Morrow*, the Wardens did not create a new danger for Puckett or render her more vulnerable to danger than had the state not acted at all. *Morrow*, 719 F.3d at 178 (quoting *Bright,* 443 F.3d at 281). In fact, Miller's decision to keep Chapman away from the control room for that period "likely made [Puckett] safer, albeit temporarily." *Id.* Stated differently, even if the Wardens allowed Chapman to return to the control room on August 3, 2013, such conduct in insufficient to create liability in that it would constitute a maintenance of the status quo. *L.R.*, 836 F.3d at 243 (citing *Morrow*, 719 F.3d at 178).

Puckett's alternate allegation that the Wardens concealed Chapman's intent to injure her from the shift commanders is also legally deficient under the circumstances. Initially, the Court agrees with the Wardens that Puckett's use of the word "concealed" appears to be carefully chosen. (Docket No. 63 at 4). Had Puckett not alleged concealment but instead alleged that the Wardens failed to warn the shift commanders about Chapman or delayed taking an employment action against her, then such allegations clearly would not amount to an affirmative act. *See Walter v. Pike County*, 544 F.3d 182, 195 (3d Cir. 2008) ("[A] state actor's failure to warn about the likelihood of a private danger – even a highly culpable failure to warn – cannot itself predicate liability."); *Phillips*, 515 F.3d at 236 (no affirmative act where a 911 supervisor deferred suspending a dangerous employee after discovering that the employee improperly used the 911 call center's computers to access confidential location information to track his ex's new boyfriend, resulting in the employee ultimately killing the ex and the boyfriend); *Sanford v. Stiles*, 456 F.3d 298, 312 (3d Cir. 2006) ("As we have stated many times, mere failure to protect an individual does not violate the Due Process Clause.") (internal marks and citation omitted). Puckett's attempt "to

morph passive inaction into affirmative acts" by baldy asserting allegations of concealment is unavailing. *Morrow*, 719 F.3d at 179.

As noted, in determining whether something is an affirmative act, courts consider whether the state actor's alleged conduct was a departure from the status quo. *L.R.,* 836 F.3d at 243. It is undisputed that Chapman's intent to harm Puckett predated any of the alleged concealment in this case. (Docket No. 55 at 4-6, 7; 65 at 3). Specifically, Chapman threatened to knock her out on May 31, 2013 but the Wardens did not allegedly conceal this fact from the shift commanders until sometime between July 1, 2013 and August 3, 2013. (*Id.*). As such, given that Chapman already intended to harm Puckett before the Wardens' alleged concealment, they did not create a new danger for her or render her more vulnerable to danger than had they not acted at all. *Morrow*, 719 F.3d at 178. "In other words, had the [Wardens] done nothing, [Puckett] would have been in the same dangerous position." *L.R.*, 836 F.3d at 243 (citing *Deshaney*, 489 U.S. at 201). The alleged concealment, therefore, did not alter the status quo and does not constitute an affirmative act.[19] *Id.*

---

[19]    In light of same, Puckett's concealment allegations stand in stark contrast to the recent state-created danger theories presented to this Court by two female high school students against school officials in Plum Borough School District, including the school resource officer, for their alleged role in covering-up and affirmatively dissuading teachers from reporting persistent rumors that a prominent teacher had been involved in inappropriate sexual relationships with students for several years, at the pleading stage. *See Doe v. Plum Borough Sch. Dist.*, 2:16-cv-1483-NBF; *Doe v. Plum Borough Sch. Dist.*, Civ. No. 2:17-cv-32-NBF, 2017 WL 3492542, *7 (W.D. Pa. 2017). Notwithstanding that the school official defendants had a duty to report such conduct pursuant to Pennsylvania's Child Protective Services Law, 23 Pa. Cons. Stat. § 6301, *et seq.*, they instead allegedly acted in concert over a substantial period of time to bury the misconduct. (*Id.*). Since Puckett is an adult, no such reporting duty existed in this case, and it would appear to this Court that any duty to protect her at work, to the extent one existed, would be borne by her *private* employer Trinity, and not the Wardens. *See Kedra*, 876 F.3d 436 at n. 6 ("We have long held that a *government employee* may bring a substantive due process claim against his [*government*] *employer* if the state compelled the employee to be exposed to a risk of harm not inherent in the workplace.") (emphasis added); *Kaucher*, 455 F.3d at 429 n. 6, 435 (explaining that a prison guard's claim against the prison for contracting MRSA were distinct from the prisoners' same claims against the prison because "these were the risks of the job" and he did not live in the jail, was free to seek outside medical treatment, and received detailed instructions on infectious disease prevention in the jail's standard operating procedures). The procedural posture of this case likewise distinguishes this case from the *Doe* cases. Notably, when Puckett's

Finally, the Court rejects Puckett's contention that delegating the task of making post assignments to the lieutenant shift commanders is an affirmative act. (Docket Nos.55 at 7; 65 at 3). This position ignores the reality that there is a natural division of labor and chain of command within jails, as there is in any other workplace. *See Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004); *Pearson v. Prison Health Svc.*, 850 F.3d 526, 540 n. 4 (3d Cir. 2017). The Wardens' act of delegating this scheduling task to a lieutenant shift commander on the weekends is plainly distinguishable from other cases where "the state actor[s] handed over their responsibility to a *private* actor who, under the circumstances, posed an obvious risk of harm to the plaintiff." *See L.R.*, 836 F.3d at 244 (emphasis added) (citing *Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989) (a police officer affirmatively misused his authority when he intervened in a dispute between a night club owner and a crime suspect and then allowed the night club owner to interrogate the suspect with physical mistreatment, leading to the suspect's death)).

In sum, although "the state-created danger analysis necessitates a fact-intensive inquiry," *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015), Puckett offers no evidence to support her allegations that the Wardens either (a) scheduled Chapman to work in the control room on August 3, 2013, or (b) concealed her intent to physically attack Puckett from the shift commanders. As such, Puckett cannot satisfy the fourth element of her claim, which requires that she establish that the Wardens affirmatively misused their authority in a way that created a danger to her or that rendered her more vulnerable to danger than had they not acted at all. *See Bright,*

---

case was at the pleading stage, the Court denied the Wardens' motion to dismiss, finding their defenses challenging whether they "engaged in sufficient affirmative acts and/or acted with the requisite intent are more properly evaluated upon a full record on summary judgment." (Docket No. 18 at 2). But Puckett's case is now at the summary judgment stage. Despite having gone through workers' compensation proceedings and extensive discovery, and in sharp contrast to the detailed allegations in the *Doe* cases, *see* (Docket No. 77 at 2:16-cv-1483; Docket No. 1 at 2:17-cv-32), her concealment allegations remain conclusory and unsupported by the evidence in the record. *See Betts*, 621 F.3d at 252.

443 F.3d at 282. Moreover, this claim fails as a matter of law, as the Wardens' purported conduct was not a departure from the status quo, *L.R.*, 836 F.3d at 243, and instead constitutes passive inaction. *See Morrow*, 719 F.3d at 179 ("[M]erely restating the Defendant's inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct."). Under the circumstances, the Warden's conduct in this case, at most, amounts to negligence. However, as Puckett's counsel conceded during oral argument, negligence alone does not violate substantive due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *DeShaney*, 489 U.S. at 202 ("[T]he Due Process Clause of the Fourteenth Amendment … does not transform every tort committed by a state actor into a constitutional violation."). Because there is no evidence in the record to transform this workplace safety claim into a viable state-created danger claim, the Wardens are entitled to summary judgment as a matter of law.[20] *Kaucher*, 455 F.3d at 435.

---

[20]     While the Wardens devoted the overwhelming majority of their arguments to the fourth element, the Court also questions whether Puckett could establish the first or second elements of her state-created danger claim on the record before the Court. "The first element … requires that the harm ultimately caused was a foreseeable and a fairly direct result of the state's actions." *Morse*, 132 F.3d at 908. Foreseeability means that the state actors were aware of a risk "sufficiently concrete" to put them on notice of the harm, and "fairly direct" means that their "actions precipitated or were the catalyst for the harm for which the plaintiff brings the suit." *Henry v. City of Erie*, 728 F.3d 275, 285 (3d Cir. 2013) (internal marks omitted). It appears to the Court that the Wardens were not aware of a sufficiently concrete risk that Chapman would fight Puckett, nor did their conduct precipitate or act as a catalyst for the fight. *Id.*; *see also Morse*, 132 F.3d at 908 (no liability where the harm is "too attenuated" from the defendants' actions). To this end, Chapman never previously physically attacked Puckett; two months had passed since Chapman threatened to knock her out during an argument; there were no other incidents between them during said two-month period; and, unlike *Morrow*, which involved *persistent* physical bullying of high school students, the alleged attack in this case arose from a disagreement between two grown women. Regarding the second element, a plaintiff must prove that the state actor acted with a degree of culpability that shocks the conscience. *Bright,* 443 F.3d at 281. Since there is nothing in the record to indicate that the Wardens faced circumstances requiring them to make a quick decision, the Court applies a deliberate indifference standard. *L.R.*, 836 F.3d at 246. In this context, deliberate indifference exists when a state actor has consciously disregarded a substantial risk of serious harm, or when the risk is so obvious that it should have been known. *Id.* This element overlaps with the first element, as it involves an inquiry into whether the risk of serious harm was foreseeable. *Kedra*, 876 F.3d at 447. Accordingly, for the same reasons just stated regarding the

## VI. CONCLUSION

Even when accepting Puckett's evidence as true and drawing all reasonable inferences in her favor, no reasonable jury could find in her favor with respect to the fourth element of her state-created danger claim. Consequently, the Wardens' motion for summary judgment is granted. Appropriate Orders to follow.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   February 1, 2018.

cc/ecf:  All counsel of record.

---

first element, the Court fails to see how the Wardens' alleged scheduling decision *or* alleged concealment was a conscious disregard of a substantial risk of serious harm. *L.R.*, 836 F.3d at 246. To the contrary, on the record before the Court, it appears that the Wardens, at most, made an incorrect or ill-advised personnel decision. *See Bishop*, 426 U.S. at 350 ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.").